RG for Agent Williams

# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

OCT 17 2017

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ CF _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
                                             ) Case No.
Facebook )
1601 Willow Road, Menlo Park, CA 94025 )    17mj 9114
                                             )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
see Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:
see Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of a Controlled Substance |
| | & |
| | Attempt and Conspiracy to Import a Controlled Ssubstance |

The application is based on these facts:
SEE ATTACHMENT C

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andre Jones Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: /0,17,2017 @ 9:30 a.m.

_____
*Judge's signature*

City and state: El Centro, CA

PETER C. LEWIS United States Magistrate Judge
*Printed name and title*

RTG for AUSA Williams

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE SEARCH OF
FACEBOOK
1601 WILLOW ROAD,
MENLO PARK, CA 94025

Case No. 17mj9114

### AFFIDAVIT IN SUPPORT OF

### AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Jones, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook username that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A.

2.     I am a Special Agent with the Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since July 2011. I am currently assigned to the HSI Office of the Assistant Special Agent in Charge, Contraband Smuggling Group 1, in El Centro, California.

3.     I am a graduate of the Criminal Investigator Course and Immigration and Customs Enforcement, Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia. I have lead and participated in investigations pertaining to the importation and distribution of controlled substances through the Calexico West, Calexico East, and Andrade Ports

1

of Entries ("POE").  In particular, I have lead and participated in the debriefings of multiple individuals who were apprehended at these POEs driving vehicles with controlled substances concealed inside.  I also have consulted with local police officers and other HSI special agents with experience investigating the importation of controlled substances through these POEs. Through these investigations, training, and consultations with other HSI special agents, I am familiar with the operations of illegal international drug trafficking organizations ("DTOs") in Mexico.

4.    I have also participated in numerous investigations involving the use of social media as a form for coordinating illicit activities.    As a result of my participation in these investigations, I have reviewed narcotics-related conversations of hundreds of individuals involved in narcotics trafficking and laundering narcotics proceeds. I have also interviewed well over 100 individuals (including arrestees and cooperating witnesses) who have been directly or indirectly involved in the importation, transportation, distribution, and manufacturing of controlled substances and the laundering of narcotics proceeds.

5.    During my prior investigations, I have directed confidential informants and cooperating witnesses to successfully infiltrate various-sized narcotics enterprises via intelligence gathering, participated in consensual recordings, and monitored purchases of controlled substances.  I have executed search warrants for controlled substances, and I have conducted surveillance operations in connection with narcotics investigations.  Also, I have spoken extensively with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews.

6.    Based on my experience, I am familiar with the methods utilized in narcotics trafficking operations and the trafficking patterns employed by narcotics organizations.  I periodically speak with agents and other law enforcement officers to gain additional information concerning the value of narcotics, narcotics

2

1  trafficking activities, and trends. I also speak with agents and other law enforcement
2  officers about their experiences and the results of their investigations and interviews.
3  I have become knowledgeable of the methods and modes of narcotics operations,
4  and the language and patterns of narcotics abuse and trafficking. I am familiar with
5  the methods of operation typically used by narcotics traffickers.

6      7.    The facts in this affidavit come from my personal observations, my
7  training and experience, and information obtained from other agents and witnesses.
8  This affidavit is intended to show merely that there is sufficient probable cause for
9  the requested warrant and does not set forth all of my knowledge about this matter.

10     8.    Based on my training and experience and the facts as set forth in this
11  affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 952, 960
12  and 963 (importation of controlled substances and conspiracy to do the same) have
13  been committed by Braulio David Pacheco Castaneda (CASTANEDA). There is
14  also probable cause to search the information, as described in Attachment A, for
15  evidence of these crimes and contraband or fruits of these crimes, as described in
16  Attachment B.

17                    **PURPOSE OF AFFIDAVIT**

18     9.    I make this affidavit in support of an application for a search warrant
19  for Facebook, Inc. ("Facebook"), as described in AttachmentA, for information
20  associated with Facebook user ID "david.castaneda.12345, " with the Facebook ID
21  Account Number 100002152880796 and vanity name "David Castaneda"
22  (hereinafter, "Target Account"), used by CASTANEDA, from July 1, 2017, to July
23  30, 2017 for items that constitute evidence, fruits and instrumentalities of violations
24  of federal criminal law, namely, 21 U.S.C. §§ 952, 960 and 963 (importation of
25  controlled substances and conspiracy to do the same), as described in Attachment B.

26     10.   The information contained in this affidavit is based on my personal
27  experience and training, consultation with other special agents and other law

3

1  enforcement officers.   The evidence and information contained herein was
2  developed from interviews with suspects, co-conspirators, queries of law
3  enforcement databases, information gained through the use of consent searches and
4  personal knowledge of the on-going criminal investigation.  Because this affidavit
5  is submitted for the limited purpose of securing a search warrant as described herein,
6  it does not include every fact known to me concerning the investigation.

### **PROBABLE CAUSE**

8      11.    On July 30, 2017, Fernanda Gonzalez-Arinaga (ARINAGA), Josselyn
9  Hernandez (HERNANDEZ) and Braulio Pacheco Castaneda (PACHECO),
10  collectively (DEFENDANTS) were arrested at the Calexico, California, East Port of
11  Entry. All three Defendants are currently charged with Conspiracy to Import
12  Methamphetamine in violation of 21 U.S.C. §§ 952, 960 and 963 (importation of
13  controlled substances and conspiracy to do the same).

14  *PRIMARY INSPECTION*

15      **12.**    On July 30, 2017, at approximately 5:01 PM, ARINAGA and
16  HERNANDEZ applied for entry into the United States through the Calexico,
17  California East Port of Entry (POE). ARINAGA was the driver and registered owner
18  of the vehicle. HERNANDEZ was a passenger in the vehicle. ARINAGA and
19  HERNANDEZ presented their DSP-150 cards to the primary officer. ARINAGA
20  provided a negative customs declaration and stated they were heading to Calexico
21  to go shopping. During the inspection, the primary officer noticed an irregular hump
22  in the rear seat. The officer also noticed irregularities in the driver's seat and front
23  passenger seat. The officer referred the vehicle to the secondary inspection area for
24  further inspection.

25  *SECONDARY INSPECTION*

26      **13.**    In secondary inspection, officers utilized a Human/Narcotics Detection
27  Dog (HNDD) to screen the vehicle. The HNDD alerted to the rear seat of the vehicle.

Further inspection revealed nine packages concealed in the driver's seat, front passenger seat and rear seat of the vehicle. A Customs and Border Protection officer probed a random package, revealing a white crystal substance which field-tested positive for methamphetamine. The methamphetamine had a total weight of approximately 18.12 kilograms (39.8 pounds). Officers placed ARINAGA and HERNANDEZ under arrest.

**14.** During the search of the vehicle, PACHECO entered the secured secondary inspection area and approached the officer who was still in the process of searching the vehicle. PACHECO asked the officer if drugs were found in the vehicle, and inquired as to the status of the vehicle's occupants. CBP officers asked PACHECO if he knew the driver of the vehicle and he replied yes. Officers detained PACHECO for further questioning.

*POST-ARREST INTERVIEWS*

**15.** Officers read ARINAGA her Miranda rights. ARINAGA agreed to waive those rights and speak with the officers. Post-Miranda, ARINAGA stated a friend identified as Daniel ARREOLA (ARREOLA) registered the Jetta, the subject vehicle in ARINAGA's name approximately 3-4 months before the date of the incident. ARINAGA stated she was instructed by ARREOLA to pick up money for him in San Diego, California. ARINAGA indicated that she had picked up money once before for ARREOLA. ARINAGA stated she told HERNANDEZ they were going to San Diego to pick up money. ARINAGA also told agents that ARREOLA provided her with $180 for the trip.

**16.** Officers read HERNANDEZ her Miranda rights as well. HERNANDEZ elected to waive her rights and also agreed to speak with the agents. HERNANDEZ stated ARINAGA picked her up from her house earlier that day in a different vehicle. After ARINAGA picked up HERNANDEZ from her home, the pair retrieved the subject vehicle. HERNANDEZ stated that when they picked up

5

the Jetta, a man identified as "Daniel" accompanied them to the Port of Entry, but got out of the vehicle at the gas station in Mexico before they got in line. HERNANDEZ also stated that ARINAGA offered to buy her food and other items if she would travel to San Diego, California with her.

**17.** Following an advisal of his Miranda rights, PACHECO stated he understood his rights and was willing to answer questions without the presence of an attorney. PACHECO stated he entered the U.S. through the Calexico, California East, POE pedestrian lanes at approximately 3:30 PM on July 30, 2017, with plans to meet his father at the gas station north of the POE, but when his father did not meet him, he decided to go back to Mexico. PACHECO stated that while he was returning south, he was uncertain of how to travel back to Mexico. PACHECO stated he entered the vehicle secondary area and recognized the Jetta by the car seat belonging to his child. PACHECO stated he and ARINAGA have a 2-year-old child together.

**18.** Agents asked PACHECO for his father's contact information, and PACHECO was unable to provide officers with this information. PACHECO did provide officers with his mother's contact information. Officers contacted PACHECO's mother, who indicated that she did not have contact information for PACHECO's father, as neither she nor PACHECO had any contact with his father.

**19.** Agents also checked PACHECO's crossing history and determined that PACHECO's last crossing into the United States took place on July 25, 2017, and not earlier that day as PACHECO previously indicated.

**20.** Agents conducted a second interview of HERNANDEZ, in which she stated that she had a Facebook conversation with PACHECO the night of July 29, 2017, about which of them, HERNANDEZ or PACHECO, was going to navigate for ARINAGA to San Diego, California. HERNANDEZ also stated that ARINAGA

6

1 │ told her that they were going to pick up money in San Diego to bring back into
2 │ Mexico.

3 │ **21.** During a second interview of PACHECO, PACHECO told agents, if he
4 │ knew agents were going to say he was involved, he would have done it himself.

5 │ *SEARCH OF HERNANDEZ'S CELLULAR TELEPHONE*

6 │ **22.** Following HERNANDEZ's arrest, a manual search of
7 │ HERNANDEZ's cellular telephone, conducted at the border, revealed a Facebook
8 │ message string, time-stamped at approximately 1500 hours on July 30, 2017,
9 │ between HERNANDEZ and the Target Account, presumed to be PACHECO's
10 │ Facebook account. The Target Account is registered to "David Castaneda." In the
11 │ message string, PACHECO asked HERNANDEZ for her location and indicated that
12 │ he was waiting at a gas station. HERNANDEZ responded that she was in line. Also
13 │ included in the message string were photographs of what appeared to be the fence
14 │ leading up to the Calexico, Port of Entry and photographs of signage located near
15 │ the Calexico, California Port of Entry.

16 │ *TECS CROSSINGS*

17 │ Agents reviewed TECS records for DEFENDANTS and the subject
18 │ vehicle, for a period dating back approximately 18 months from the date of the
19 │ incident. A review of ARINAGA's crossing history shows ARINAGA first crossed
20 │ in the subject vehicle, on July 1, 2017. Additionally, a review of the subject vehicle's
21 │ crossing history shows May 21, 2017 was the first registered crossing for the vehicle
22 │ in the last 18 months.

23 │ //

24 │ **PRIOR ATTEMPTS TO OBTAIN DATA**

25 │ 23. Except as otherwise mentioned above, the United States has not
26 │ attempted to obtain this data by other means except where as described above.

27 │ **FACEBOOK, INC.**

24.     Facebook, Inc. is an Internet company which, among other things, provides electronic communication services to its subscribers. Facebook's electronic mail/communication service allows Facebook subscribers to communicate and share with other Facebook subscribers and with others through the Internet. Facebook subscribers access Facebook's services through the Internet.

25.     Subscribers to Facebook use screen names during communications with others. The screen names may or may not identify the real name of the person using a particular screen name. Although Facebook requires users to subscribe for a free Facebook account, Facebook does not verify the information provided by the Facebook subscriber for its free services.

26.     At the creation of a Facebook account and for each subsequent access to the account, Facebook logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet. IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular Facebook account often identifies the Internet Service Provider that owns and has leased that address to its customer. Subscriber information for that customer then can be obtained using appropriate legal process.

27.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

28.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for

password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

29.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

30.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

31.   Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can

"check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

32.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

33.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

34.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

35.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts

or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

36. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

37. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

38. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

39. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

40. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

41. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

42.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:   profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

43.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

44.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or

1  consciousness of guilt (e.g., deleting account information in an effort to conceal
2  evidence from law enforcement).

3      46.    Therefore, the computers of Facebook are likely to contain all the
4  material described above, including stored electronic communications and
5  information concerning subscribers and their use of Facebook, such as account
6  access information, transaction information, and other account information.

7                    **GENUINE RISKS OF DESTRUCTION**

8      47.    Based upon my experience and training, and the experience and training
9  of other agents with whom I have communicated, electronically stored data can be
10 permanently deleted or modified by users possessing basic computer skills.

11            **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

12     48.    Federal agents and investigative support personnel are trained and
13 experienced in identifying communications relevant to the crimes under
14 investigation. The personnel of Facebook are not.  It would be inappropriate and
15 impractical for federal agents to search the vast computer network of the Facebook
16 for the relevant accounts and then to analyze the contents of those accounts on the
17 premises of Facebook. The impact on the Facebook's business would be severe.

18     49.    Therefore, I request authority to seize all content, including electronic
19 mail and attachments, stored instant messages, stored voice messages, photographs
20 and any other content from the Facebook accounts, as described in Attachment A.
21 In order to accomplish the objective of the search warrant with a minimum of
22 interference with the business activities of Facebook, to protect the rights of the
23 subject of the investigation and to effectively pursue this investigation, authority is
24 sought to allow Facebook to make a digital copy of the entire contents of the
25 accounts subject to seizure.  That copy will be provided to me or to any authorized
26 federal agent.  The copy will be forensically imaged and the image will then be
27 analyzed to identify communications and other data subject to seizure pursuant to

1 Attachment B. Relevant data will be copied to separate media. The original media
2 will be sealed and maintained to establish authenticity, if necessary.

3      50.    Analyzing the data to be provided by Facebook requires special
4 technical skills, equipment and software. It also can be very time-consuming.
5 Searching by keywords, for example, often yields many thousands of "hits," each of
6 which must be reviewed in its context by the examiner to determine whether the data
7 is within the scope of the warrant. Merely finding a relevant "hit" does not end the
8 review process. Certain file formats do not lend themselves to keyword searches.
9 Keywords search text. Many common electronic mail, database and spreadsheet
10 applications, which files may have been attached to electronic mail, do not store data
11 as searchable text. The data is saved in a proprietary non-text format. And, as the
12 volume of storage allotted by service providers increases, the time it takes to
13 properly analyze recovered data increases dramatically.

14      51.    Based on the foregoing, searching the recovered data for the
15 information subject to seizure pursuant to this warrant may require a range of data
16 analysis techniques and may take weeks or even months. Keywords need to be
17 modified continuously based upon the results obtained. The personnel conducting
18 the segregation and extraction of data will complete the analysis and provide the data
19 authorized by this warrant to the investigating team within ninety (90) days of receipt
20 of the data from the service provider, absent further application to this court.

21      52.    Based upon my experience and training, and the experience and training
22 of other agents with whom I have communicated, it is necessary to review and seize
23 all electronic mails that identify any users of the subject account(s) and any
24 electronic mails sent or received in temporal proximity to incriminating electronic
25 mails that provide context to the incriminating mails.

26

27

1      53.    All forensic analysis of the imaged data will employ search protocols
2 directed exclusively to the identification, segregation and extraction of data within
3 the scope of this warrant.

4         **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

5      54.   I  anticipate  executing  this  warrant  under  the  Electronic
6 Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and
7 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the
8 government copies of the records and other information (including the content of
9 communications) particularly described in Section I of Attachment B. Upon receipt
10 of the information described in Section I of Attachment B, government-authorized
11 persons will review that information to locate the items described in Section II of
12 Attachment B.

13                      **CONCLUSION**

14      55.   Based upon the foregoing, specifically the following: (1) agents
15 discovered 18.12 kilograms of methamphetamine in a vehicle driven by
16 PACHECO's girlfriend, ARINAGA; (2) as agents were still searching the subject
17 vehicle, PACHECO unprompted, entered the secured secondary inspection area at
18 the Calexico, California, East Port of Entry, identified the subject vehicle and
19 thereafter asked agents whether drugs were discovered in the vehicle; (3) post-arrest,
20 PACHECO told agents that if he knew they were going to say he was involved, he
21 would have done it himself; (4) Facebook communications between Co-Defendants,
22 HERNANDEZ and ARINAGA, appear to discuss HERNANDEZ and PACHECO
23 serving as navigators for ARINAGA, which is believed to be in the furtherance of
24 drug smuggling; (4) HERNANDEZ admitted to communicating with PACHECO
25 presumably via the Target Account; and (5) agents discovered Facebook messages
26 from the Target Account on HERNANDEZ's phone, close in time to
27 DEFENDANTS' arrest, in which PACHECO inquired as to HERNANDEZ's

1  location and indicated that he was waiting for her at the gas station, I believe there
2  is probable cause to believe the items identified in Attachment B have been used in
3  the commission of a crime and constitute evidence, fruits, and instrumentalities of
4  violations of 21 U.S.C. §§ 952, 960 and 963 will be found on the item to be searched
5  as provided in Attachment A.

6  _____
7  Andrew B. Jones
   Special Agent, Homeland Security Investigations
8
9
10  Subscribed and sworn to before me this ___/7th___ day of October, 2017.
11
12  _____
13  HONORABLE PETER C. LEWIS
    United States Magistrate Judge
14
15
16
17
18
19
20
21
22
23
24
25
26
27

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# **ATTACHMENT A**

## **Property to Be Searched**

This warrant applies to information associated with Facebook user ID "david.castaneda.12345," with the Facebook ID Account Number 100002152880796 and vanity name "David Castaneda" that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered at 1601 Willow Road, Menlo Park, CA 94025.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each username listed in Attachment A:

(a)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities for the time period of May 1, 2017, to July 30, 2017, to include the following: All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers for access to the Target Account, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All photographs and videos uploaded by that username and all photographs and videos uploaded by any user that have that user tagged in them;

(c)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; tags; and information about the user's access and use of Facebook applications;

(d)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(e)     All "check ins" and other location information;

(f)     All IP logs, including all records of the IP addresses that logged into the account;

(g)     All information about the Facebook pages that the account is or was a "fan" of;

(h)     All past and present lists of friends created by the account;

(i)     All records of Facebook searches performed by the account;

(j)     The types of service utilized by the user;

(k)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(l)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(m)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**II.     Items subject to seizure**

All subscriber and/or user information, all electronic mail, images, GPS tags, text messages, private messages (Messenger), comments, likes, histories, buddy lists included individuals following and individuals followed, profiles, method of payment, detailed billing records, access logs, transactional data and any other files associated with the following account for the following periods of May 1, 2017 to July 30, 2017:

1
2

**Facebook user ID   "david.castaneda.12345, " with the Facebook ID Account Number 100002152880796 and vanity name "David Castaneda"**

3
4
5
6
7
8
9

The search of the data supplied by Facebook.com pursuant to this warrant will be conducted as provided in the "Procedures For Electronically Stored Information" of the incorporated affidavit submitted as an attachment to the affidavit submitted in support of this search warrant and will be limited to seizing electronic subscriber and/or user information, photographs and/or attachments, electronic mail and communications tending to show evidence of 21 U.S.C. §§ 952, 960 and 963 including:

10
11
12
13
14

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

15
16

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

17
18

(c)     All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them to include EXIF data;

19
20
21
22
23
24
25

(d)     All Neoprints, including profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

26
27

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(n)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(o)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(p)     All email communications to include but not limited to; sent, received, deleted, drafted, and stored in the accounts listed above.

22